Ben M. Krowicki, Esq.
Deborah S. Freeman, Esq.
Bingham McCutchen LLP
One State Street
Hartford, Connecticut 06103
(860) 240-2700

Philip L. Blum, Esq.
Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022
(212) 705-7000

Carol G. Snyder, Esq.
Hedwig M. Auletta, Esq.
Damon & Morey LLP
298 Main Street
1000 Cathedral Place
Buffalo, New York 14202-4096
(716) 856-5500

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LOUIS E. THYROFF and VALERIE THYROFF, | : | |
| | : | Civil Case Number: 05-CV- |
| Plaintiff, | : | |
| | : | |
| - against - | : | **NOTICE OF REMOVAL** |
| | : | |
| NATIONWIDE MUTUAL INSURANCE COMPANY, SHARON EASTMAN, RANDY FERRARO, and DUANE WELDON, | : | |
| | : | |
| Defendants. | : | |

TO: THE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK

**PLEASE TAKE NOTICE** that Defendants Nationwide Mutual Insurance Company ("Nationwide"), Sharon Eastman ("Eastman"), Randy Ferraro ("Ferraro") and Duane Weldon ("Weldon") hereby remove the above-entitled action from the Supreme Court of the

State of New York, County of Monroe, to the United States District Court for the Western District of New York.

In support of this notice, defendants respectfully state:

1. Upon information and belief, plaintiffs Louis E. Thyroff and Valerie Thyroff are residents of the State of New York, County of Monroe.

2. Defendant Nationwide is a corporation duly organized under the laws of the State of Ohio, having its principal place of business in the State of Ohio.

3. Defendant Eastman is a resident of the State of New York, County of Monroe.

4. Defendant Ferraro is a resident of the State of New York, County of Monroe.

5. Defendant Weldon is a resident of the State of New York, County of Yates.

6. On or about October 25, 2005, Plaintiffs commenced an action in the Supreme Court of the State of New York, Country of Monroe (Index No. 05-12017), by filing a Summons and Complaint. Plaintiffs' Complaint seeks monetary damages.

7. Pursuant to Local Rule 81, an index of the documents filed in connection with this action is annexed hereto.

8. Plaintiffs' Summons and Complaint were served on Defendant Nationwide on or about October 26, 2005.

9. Plaintiffs' Summons and Complaint were served on Defendant Eastman on October 26, 2005.

10. Plaintiffs' Summons and Complaint were served on Defendant Ferraro on October 26, 2005.

11. Plaintiffs' Summons and Complaint were served on Defendant Wilson on November 4, 2005.

12. Nothing in this Notice is intended to be, or shall be deemed to be, an admission of the presence of personal jurisdiction over any Defendant.

13. This Notice of Removal is being filed within thirty (30) days after receipt by each Defendant of Plaintiffs' Summons and Complaint and is therefore timely under 28 U.S.C. § 1446(b).

14. Defendants respectfully remove this action to this Court pursuant to 28 U.S.C. §§ 1332, 1441(a), 1446 (a) and (b) on the grounds that diversity of citizenship exists between Plaintiffs and Defendant Nationwide, and that non-diverse Defendants Eastman, Ferraro and Weldon were fraudulently joined, and the amount of controversy exceeds $75,000, exclusive of interest and costs.

**WHEREFORE**, Defendants give notice that the action referred to above is removed from the Supreme Court of the State of New York, County of Monroe, to this Court on the date herein below written.

Dated: New York, New York
November 14, 2005

**BINGHAM McCUTCHEN LLP**

By: /s/ Philip L. Blum
Philip L. Blum (PB 9551)

Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022
(212) 705-7000 (phone)
(212) 752-5378 (fax)

Ben M. Krowicki, Esq.
Deborah S. Freeman, Esq.
Bingham McCutchen LLP
One State Street
Hartford, Connecticut 06103
(860) 240-2700

Carol G. Snyder, Esq.
Hedwig M. Auletta, Esq.
Damon & Morey LLP
298 Main Street
1000 Cathedral Place
Buffalo, New York 14202-4096
(716) 856-5500

*Attorneys for Defendants*

TO: Lisa Serio Siragusa, Esq.
Brown & Tarantino, LLC
45 Exchange Boulevard, Suite 300
Rochester, New York 14614
(585) 454-3377

William P. Tedards, Jr.
1101 30th Street, N.W. Suite 500
Washington, D.C. 20007
(202) 797-9135
Attorneys for Plaintiffs

Ben M. Krowicki, Esq.

Deborah S. Freeman, Esq.
Bingham McCutchen LLP
One State Street
Hartford, Connecticut 06103
(860) 240-2700

Philip L. Blum, Esq.
Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022
(212) 705-7000

Carol G. Snyder, Esq.
Hedwig M. Auletta, Esq.
Damon & Morey LLP
298 Main Street
1000 Cathedral Place
Buffalo, New York 14202-4096
(716) 856-5500

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUIS E. THYROFF and VALERIE THYROFF,<br><br>Plaintiff,<br><br>- against -<br><br>NATIONWIDE MUTUAL INSURANCE COMPANY, SHARON EASTMAN, RANDY FERRARO, and DUANE WELDON,<br><br>Defendants. | Civil Case Number: 05-CV-<br><br>**LOCAL RULE 81 INDEX OF FILED DOCUMENTS** |

Pursuant to Local Rule 81 of the United States District Court for the Western District of New York, Defendants identify and annex the following documents:

- Summons to Defendants, filed on October 25, 2005, annexed hereto as *Exhibit A*.
- Complaint against Defendants, filed on October 25, 2005, annexed hereto as *Exhibit B*.

The aforementioned documents represent all of the documents filed in connection with the state court action as of the time of the filing of the annexed Notice of Removal.

Dated: New York, New York
November 14, 2005

**BINGHAM McCUTCHEN LLP**

By:__/s/ Philip L. Blum____________________
Philip L. Blum

Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022
(212) 705-7000 (phone)
(212) 752-5378 (fax)

Ben M. Krowicki, Esq.
Deborah S. Freeman, Esq.
Bingham McCutchen LLP
One State Street
Hartford, Connecticut 06103
(860) 240-2700

Carol G. Snyder, Esq.
Hedwig M. Auletta, Esq.
Damon & Morey LLP
298 Main Street
1000 Cathedral Place
Buffalo, New York 14202-4096
(716) 856-5500

Attorneys *for Defendants*

**CERTIFICATE OF SERVICE AND FILING**

I, Hedwig M. Auletta, Esq., hereby certify and affirm that on the 15th day of November 2005, I filed the foregoing Notice of Removal and annexed Local Rule 81 Index of Filed Documents and served the same via First Class United States Mail upon:

Lisa Serio Siragusa, Esq.
Brown & Tarantino, LLC
45 Exchange Boulevard, Suite 300
Rochester, New York 14614
(585) 454-3377

William P. Tedards, Jr.
1101 30th Street, N.W. Suite 500
Washington, D.C. 20007
(202) 797-9135

*Attorneys for Plaintiffs*

_/s/Hedwig M. Auletta________
Hedwig M. Auletta , Esq.
Damon & Morey LLP
*Attorneys for Defendants*
1000 Cathedral Place
298 Main Street
Buffalo, New York 14202-4096
(716) 856-5500
hauletta@damonmorey.com

RECYCLED

Exhibit A

STATE OF NEW YORK
SUPREME COURT COUNTY OF MONROE

LOUIS E. THYROFF and VALERIE THYROFF,

Plaintiffs,

vs.

NATIONWIDE MUTUAL INSURANCE COMPANY,
One Nationwide Plaza, Colombus, Ohio 43215,
SHARON EASTMAN,
64 Barrington Street, Rochester, New York 14607,
RANDY FERRARO,
1630 Lake Road, Webster, New York 14580,
DUANE WELDON,
1816 North Clinton Avenue, Rochester, New York14621,

Defendants.

Index No. 05-12017

Plaintiffs designate Monroe County as the place of trial

The basis of the venue is plaintiffs' residence

**SUMMONS**

Plaintiffs reside at
81 Knickerbocker Rd.
Pittsford, New York
14534

County of Monroe

To the above named Defendants:

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiffs' Attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: October 25, 2005
Rochester, New York

BROWN & TARANTINO, LLC
Attorneys for Plaintiffs
LOUIS E. THYROFF and
VALERIE THYROFF

By: Lisa Serio Siragusa
Lisa Serio Siragusa, Esq.
BROWN & TARANTINO, LLC
45 Exchange Boulevard, Suite 300
Rochester, New York 14614
(585) 454-3377

WILLIAM P. TEDARDS, JR., ESQ.
1101 30th Street, N.W., Suite 500
Washington, D.C. 20007
(202) 797-9135



Exhibit B

STATE OF NEW YORK
SUPREME COURT COUNTY OF MONROE

LOUIS E. THYROFF and VALERIE P. THYROFF,

Plaintiffs,

**VERIFIED COMPLAINT**

-vs-

Index No. 05-12017

NATIONWIDE MUTUAL INSURANCE COMPANY, SHARON EASTMAN, RANDY FERRARO, and DUANE WELDON,

Defendants.

Plaintiffs, by their attorneys, Brown & Tarantino, LLC and William P. Tedards, Jr. Esq., for their Verified Complaint against the Defendants, allege as follows:

**JURISDICTION**

1. The Plaintiffs, Louis E. Thyroff and Valerie P. Thyroff are and were, at all times relevant herein, residents of the County of Monroe, State of New York.

2. Upon information and belief, the Defendant, Nationwide Mutual Insurance Company ("hereafter Nationwide") is a foreign corporation duly organized under the laws of Ohio and, at all times relevant herein, was authorized to do business in the State of New York.

3. Upon information and belief, the Defendant, Sharon Eastman, is and was, at all times hereafter mentioned, a resident of the County of Monroe, State of New York.

4. Upon information and belief, Defendant Sharon Eastman, is and was, at all times hereafter mentioned, an insurance agent and independent contractor under contract with Defendant Nationwide.

5. Upon information and belief, Defendant Sharon Eastman, does and did, at all times hereafter mentioned, maintain an office for an insurance agency at 26 Corporate Woods, Rochester, New York 14623.

6. Upon information and belief, the Defendant, Randy Ferraro, is and was, at all times hereafter mentioned, a resident of the County of Monroe, State of New York.

7. Upon information and belief, Defendant Randy Ferraro, is and was, at all times hereafter mentioned, an insurance agent and independent contractor under contract with Defendant Nationwide.

8. Upon information and belief, Defendant Randy Ferraro, does and did, at all times hereafter mentioned, maintain an office for an insurance agency at 771 Ridge Road, Webster, New York 14580.

9. Upon information and belief, the Defendant, Duane Weldon, is and was, at all times hereafter mentioned, a resident of the County of Monroe, State of New York.

10. Upon information and belief, Defendant Duane Weldon, is and was, at all times hereafter mentioned, an insurance agent and independent contractor under contract with Defendant Nationwide.

11. Upon information and belief, Defendant Duane Weldon, does and did, at all times hereafter mentioned, maintain an office for an insurance agency at 1876 North Clinton Avenue, Rochester, New York 14621.

12. As a result of the actions of the Defendants stated herein, Plaintiffs Louis E. Thyroff and Valerie Thyroff have sustained general and special damages which exceed the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## THE NATURE OF THE ACTION

13. This is a tort action arising from a conspiratorial malicious prosecution, seeking compensatory damages for a special injury to the Plaintiffs, emotional distress damages, loss of society, services, and consortium damages, and punitive damages.

14. This action arises out of a conspiratorial scheme amongst the Defendants to destroy the business of Louis E. Thyroff, culminating in the malicious instigation and maintenance of a groundless civil action and associated predatory actions.

15. Plaintiff, Louis E. Thyroff, was an insurance agent in Rochester, who operated under a contract with Nationwide for over twenty years.

16. Prior to September 2000, Nationwide faced widespread dissatisfaction among its agents and corresponding loss of policyholder revenue.

17. Prior to September 2000, Nationwide faced numerous agent resignations and corresponding loss of policyholder revenue.

18. As a result, Nationwide developed and implemented a scheme to (a) target agents who appeared likely to resign, (b) terminate their contracts on invented pretexts, and (c) simultaneously confiscate all of their policyholder information so they would not be able to compete with Nationwide after the termination.

19. Nationwide mistakenly targeted Louis Thyroff for termination under this scheme.

20. Prior to September 2000, Louis Thyroff had no intention of resigning his contract with Nationwide.

21. In September 2000 Nationwide terminated the contract.

22. As part of its termination process Nationwide simultaneously deprived Louis Thyroff of all of his business information via computer manipulation.

23. After terminating Louis Thyroff's, contract, Nationwide began to develop a scheme to deny Thyroff substantial post-termination payments which were due him under the contract.

24. Nationwide enlisted other independent contractor agents, who were to be awarded portions of Thyroff's business, to assist in the scheme.

25. Several agents agreed to assist in the scheme, including the three named as defendants herein.

26. These agents were motivated to assist in the scheme because, if the scheme succeeded, they would be given their portions of Louis Thyroff's business for free, rather than having to purchase it under Nationwide's normal procedures.

27. The agents were also motivated by a desire to disable Louis Thyroff financially, so that he would be unable to return to the business at a later date.

28. In October of 2000, Louis Thyroff filed a federal action against Nationwide.

29. In December 2000, Nationwide filed a counterclaim.

30. Nationwide's counterclaim in the federal court action alleged, among other things, that Louis Thyroff was soliciting Nationwide policyholders to try to take them away from Nationwide and furnishing confidential Nationwide policyholder information to other companies.

31. On the basis of unsubstantiated and false allegations set forth in the counterclaim, Nationwide withheld substantial payments that it was contractually obligated to make to Louis Thyroff after the termination of the contract.

32. When Nationwide prepared and filed its counterclaim, and at all times thereafter, Nationwide was aware that the allegations in the counterclaim were without any good faith basis, unsubstantiated, without merit, frivolous and false and that the post-termination payments which Nationwide was withholding on the basis of the allegations in the counterclaim were owed to Louis Thyroff and he should have been paid.

33. Despite awareness of the lack of probable cause for the counterclaim, Nationwide maintained the allegations in the counterclaim and refused to make the payments until November of 2004.

34. When it prepared and filed the counterclaim, and for several months thereafter, Nationwide conspired with Defendants Sharon Eastman, Randy Ferraro, and Duane Weldon to fabricate and manufacture false evidence to support the allegations in the counterclaim in a continuing scheme to withhold the post-termination payments.

35. In furtherance of the conspiracy, Nationwide solicited and promised Defendants Sharon Eastman, Randy Ferraro, and Duane Weldon that they could have a portion of Louis Thyroff's business for free if they would produce information that Nationwide could use to assert that Louis Thyroff was soliciting Nationwide policyholders. Normally, agents who are given the business of departing agents are required to make a substantial investment to purchase the business.

36. False information, solicited by Nationwide and supplied by Defendants Sharon Eastman, Randy Ferraro, and Duane Weldon, assisted Nationwide in furtherance of its meritless counterclaim and Nationwide's scheme to charge Thyroff with solicitation and withhold his payments.

37. On April 14, 2004, Louis Thyroff moved for summary judgment seeking dismissal of Nationwide's counterclaim in the federal action.

38. On October 26, 2004, United States District Court Judge Michael A. Telesca granted Louis Thyroff's motion, dismissed Nationwide's counterclaim and found that Nationwide had no basis for claiming that Louis Thyroff was competing with Nationwide after the contract termination.

39. No appeal has been taken from the Decision of Judge Telesca and the time for filing and service of a Notice of Appeal has expired.

**GENERAL ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION**

40. Nationwide is an insurance business operating throughout the United States, using a marketing, sales, and service network of independent contractor agents.

41. Plaintiff, Louis E. Thyroff entered into his contract with Nationwide on December 15, 1979, and the form was revised on October 13, 1988. A copy of the revised contract is attached as Exhibit A.

42. Plaintiff, Valerie Thyroff, operating primarily from a home office, was an employee who handled the bookkeeping and accounting functions of Louis Thyroff's agency and supervised the business when Louis Thyroff was ill or absent.

43. Valerie Thyroff, is and was, at all times hereafter mentioned, the spouse of Louis Thyroff and she is entitled to society, services and consortium of her spouse Louis Thyroff.

44. Over a period of approximately twenty years, Thyroff and his wife developed a large and successful insurance business for themselves and for Nationwide in the Rochester area.

45. Under the terms of the contract between Nationwide and Louis Thyroff, Louis Thyroff was an independent contractor for all purposes with the right and obligation to exercise independent judgment as to the solicitation and selection of his policyholders, the servicing of his policyholders, and all other actions necessary to carry out the provisions of the contract between himself and Nationwide.

46. Louis Thyroff developed his own clients in his own community.

47. Louis Thyroff's success led to numerous awards and other types of recognition and earned him high regard from his policyholders and from Nationwide.

48. Beginning in early 1998, Nationwide began to lose large numbers of agents in various markets, particularly in New York.

49. The reasons for widespread agent dissatisfaction and large numbers of resignations included non-competitive insurance rates, the withdrawal of desirable insurance products, the introduction of brokerage channels (forcing agents to do business through intermediaries), and reduction of commission rates.

50. The departing agents took substantial amounts of business with them, as many of their clients naturally chose to stay with their agents, with whom they had strong relationships, rather than the Nationwide company.

51. Nationwide first attempted to meet this competitive challenge by improving its relationships with policyholders (emphasizing quick response and focused customer contacts), trying to make resignation financially less attractive to agents by demonstrating that it could retain policyholders and control the business. This defensive marketing approach was given the name "Reflex Action Plan."

52. Unable to stem the tide of resignations by appealing to policyholders, Nationwide next began an aggressive litigation program, suing resigning agents for missaproriation of "trade secrets" and exclusive proprietary information and breaches of covenants not to compete.

53. One motivation for these aggressive lawsuits was to intimidate other agents who might be considering resignation.

54. This litigation program was unsuccessful. The courts ruled that Nationwide had no basis in the contract or at common law to claim a trade secret or proprietary interest in the policyholder information.

55. In late 1999, Nationwide introduced a new pre-emptive strategy based on unilateral contract terminations coupled with the confiscation of policyholder information.

56. As this plan developed, regional and local managers in New York were instructed to identify agents who might be contemplating resignation and were given example fact patterns to look for in making the identifications.

57. When an agent was targeted as a potential resignation possibility, the managers were instructed to create a pretext for a termination by Nationwide, terminate the agent's contract, and simultaneously engineer a "lockout" of the agent's business, permanently blocking the agent from access to his or her computerized policyholder records. The lockout was to be in effect at the time the agent learned of the termination of the contract, so that the agent would have no opportunity to make copies of the records and continue with his/her business.

58. Louis Thyroff had no intention of resigning his contract or leaving the Nationwide system.

59. Nevertheless, Louis Thyroff was targeted under the Reflex Action Plan as a potential defector and, over the next few months, his contract was set up for a termination and "lockout" under the Reflex Action Plan.

60. On September 19, 2000, Nationwide ordered Louis Thyroff to come to a meeting in Syracuse, New York. Louis Thyroff went to the meeting as scheduled, unaware of its purpose.

61. At the meeting, Nationwide's New York Sales Manager, David Dewez, and Margaret Eltz, who worked for Dewez, announced to Louis Thyroff that his contract would be immediately terminated.

62. During the meeting, the "lockout" portion of the Reflex Action plan, cutting off Louis Thyroff's access to the policyholder information, was implemented and Louis Thyroff's staff was immediately unable to access their policyholder information via the computer system where the information was stored.

63. Louis Thyroff was in effect denied any opportunity to retrieve policyholder information after learning that his contract was being terminated.

64. The purpose of this "lockout" was to assure that Louis Thyroff would not be able to compete with Nationwide for the business of his Nationwide policyholders after the contract was terminated.

65. At the time of the termination, Eltz retained a forensic computer specialist to search a computer disc that she had taken from Louis Thyroff's office for information which Nationwide could use to assert that Louis Thyroff was starting a new business and taking policyholder information for use in the new business.

66. No information or data was found which could be used to support an assertion that Louis Thyroff was starting a new business or taking Nationwide policyholder information for use in establishing a new separate business.

67. After the termination, Louis Thyroff was entitled to receive substantial payments from Nationwide in the form of Agency Security Compensation ("ASC"), so long as he did not solicit Nationwide policyholders within the first year or furnish others with Nationwide policy holder information.

68. With his contract terminated, and having been deprived of all of his business records and disabled from continuing in business, Louis Thyroff took all necessary action to protect those substantial ASC payments.

69. Louis Thyroff took every possible measure to avoid even the appearance of competition with Nationwide. He returned all the equipment and materials of his agency to Nationwide, gave any "brokered" business not underwritten by Nationwide to a separate unrelated agency, and made no attempt whatsoever to contact Nationwide policyholders.

70. Louis Thyroff needed to protect his post-termination payments because, having been deprived of his ongoing business, these payments were the only remaining source of support for Louis Thyroff and his family.

71. With his contract pretextually terminated and all of his business information confiscated, Thyroff also filed an action against Nationwide in the U.S. District Court.

72. Pursuant to the contract, Nationwide could also withhold ASC payments if the agent had commingled funds.

73. Shortly after the termination Nationwide attempted to establish a basis for denial of the ASC payments under the commingling provision by hiring a private investigator to interview Deborah Jones, an employee of Louis Thyroff's agency.

74. Upon information and belief, the investigator attempted to establish that Louis Thyroff had commingled funds, but learned that Ms. Jones handled the funds and that funds had never been commingled.

75. On December 20, 2000, Nationwide filed an action against Louis Thyroff in the form of a counterclaim in the federal lawsuit.

76. Nationwide's counterclaim was filed without factual basis or probable cause and alleged, among other things, that "Thyroff, since the cancellation of the Agent's Agreement, has both directly and indirectly influenced and induced Nationwide policyholders to lapse, cancel and otherwise replace current, in force, insurance contracts with Nationwide". See Paragraph 109 of Defendants' Answer to Plaintiff's Complaint. (Attached hereto as Exhibit "B".)

77. Nationwide further alleged in its counterclaim, again without factual basis or probable cause that "Thyroff, since the termination of the Agent's Agreement, has furnished to more than one person or organization proprietary and confidential information relating to Nationwide policyholders, including but not limited to, names, addresses, phone numbers and expiration dates." See Paragraph 110 of Defendants' Answer to Plaintiff's Complaint. (See Exhibit B.)

78. As part of a civil conspiracy, Nationwide contacted agents who were being given substantial portions of Thyroff's business, including Defendants Sharon Eastman, Randy Ferraro, and Duane Weldon, and conspired with them to develop information which Nationwide could

use to assert that Louis Thyroff was soliciting his Nationwide policyholders after the contract termination.

79 Defendants Sharon Eastman, Randy Ferraro, and Duane Weldon, among others, would receive substantial portions of Louis Thyroff's large business for free if they would give Nationwide information that could be used to assert that Louis Thyroff was attempting to compete.

80. In his 21 years as a Nationwide Agent, through much effort and hard work, Louis Thyroff had established a large book of business with over 6000 active policies in force within his agency.

81. Upon information and belief, as of year end 2000, defendant Sharon Eastman had approximately 1,648 policies.

82. Upon information and belief, as of year end 2000, defendant Randy Ferraro had approximately 3,102 policies.

83. Upon information and belief, as of year end 2000, defendant Duane Weldon had approximately 1,853 policies.

84. Without an official determination that Louis Thyroff, was competing, the defendants Sharon Eastman, Randy Ferraro, and Duane Weldon would have to purchase the new accounts from Nationwide for a substantial price.

85. Weeks and months following the termination of Louis Thyroff's contract, Nationwide pressed agents for information that could be used to assert that Louis Thyroff was competing, appealing to the agents who were dividing up Thyroff's business, including

Defendants Sharon Eastman, Randy Ferraro, and Duane Weldon, in their desire to get Louis Thyroff's business for free.

86. The three individual defendants responded with a continuing stream of false information and unfounded accusations, designed to give Nationwide what it wanted. On information and belief, the three agents took all of the actions described in Paragraphs 87 through 104, below (presented as examples) and more.

87. On or about November 30, 2000, defendant Randy Ferraro said he had run into two situations with former Louis Thyroff clients who indicated that Louis Thyroff would be handling their insurance and/or getting them quotes from other insurance carriers.

88. Shortly before November 30, 2000, defendant Sharon Eastman gave defendant Randy Ferraro similar information to pass on to Nationwide.

89. Shortly before December 2, 2000, defendant Randy Ferraro indicated he had talked with a commercial customer who stated that Louis Thyroff was handling his policy renewal.

90. Shortly before December 2, 2000, defendant Sharon Eastman said that Louis Thyroff's insurance agency was still open and that he had a staff handling business.

91. On or about December 6, 2000, defendant Duane Weldon indicated that Louis Thyroff was conveying unfavorable information about Nationwide to the market, thereby damaging Nationwide's ability to compete for important accounts.

92. Also on or about December 6, 2000, defendant Duane Weldon indicated that the signature on an "ACCORD form" (the form Nationwide receives when a policyholder leaves Nationwide to transfer to another insurer) was Louis Thyroff's and further suggested that the

departing policyholder had been coached by Louis Thyroff to hide his identity as the agent who had signed the form.

93. On or about December 6, 2000, defendant Sharon Eastman told Nationwide that Louis Thyroff was still in his office working, that the office was intact, and that there was no sign of his packing up to make way for a new tenant.

94. On or about December 6, 2000, defendant Sharon Eastman indicated that copies of Louis Thyroff's client list were "floating around," available to the market.

95. On or about December 6, 2000, defendant Duane Weldon stated that he believed Louis Thyroff was a "hostile agent" (i.e., a competitor).

96. On or about January 8, 2001, defendant Duane Weldon suggested that Louis Thyroff had led an insurance brokerage group to his former Nationwide book of business "by association," and it was his (Weldon's) view that Nationwide should consider that a violation of a non-compete clause.

97. On or about January 18, 2001, defendant Duane Weldon said that he had lost accounts because of activity by Louis Thyroff that "poisoned the water" and made retention of the accounts impossible.

98. On or about January 18, 2001, defendant Duane Weldon indicated that two former associate agents of Louis Thyroff's (who had been employed in his agency) were working for a separate company, which would in his opinion (Weldon's) constitute a contract violation.

99. On or about February 22, 2001, defendant Duane Weldon suggested that Louis Thyroff was operating as a "ghost agent" on the books of an independent brokerage organization.

100. On or about February 22, 2001, defendant Duane Weldon suggested that Nationwide should get "court papers" by demanding accounting records relating to Louis Thyroff.

101. On or about February 26, 2001, defendant Randy Ferraro indicated that Louis Thyroff had stripped policyholder files before turning them over to Nationwide and that the Thyroff agency had spent "weeks" cleaning out the files before they were turned over.

102. On or about February 27, 2001, defendant Duane Weldon suggested that Louis Thyroff was engaged in a "clandestine affiliation" with an insurance broker.

103. On or about March 16, 2001, defendant Sharon Eastman indicated again that Louis Thyroff's book of business was available to the market.

104. On March 28, 2001, defendant Sharon Eastman indicated that a client told her that he had just spoken with Louis Thyroff regarding a claim and had gotten advice from Louis Thyroff.

105. During this period, prior to initiation of the counterclaim and thereafter, Nationwide had no evidence showing that Thyroff was competing with Nationwide in any way. Conversely, Nationwide had proof of the lack of competition in that (1) it received service calls from former customers of Louis Thyroff after he was fired; (2) the information uploaded from Thyroff Agency's computers to Nationwide's computers did *not* provide any indication that Louis Thyroff was transferring policyholders or otherwise attempting to compete with Nationwide; and (3) no large number of ACCORD cancellation forms (a form used when a customer seeks transfer from one insurance company to another, i.e., from Nationwide to some other company) were received by Nationwide.

106. In the months after Louis Thyroff's termination, Nationwide was repeatedly advised by its own personnel that there was no evidence that Louis Thyroff was going into competition against Nationwide after his termination.

107. After Louis Thyroff's termination, Nationwide retained substantially all of the customers originated by the Thyroff Agency.

108. Nationwide also knew that Louis Thyroff was *unable* to compete with Nationwide after the termination because Nationwide had confiscated all of his business information at the time of the termination (as described above), for the precise purpose of *disabling* him from competing.

109. Nationwide also had information provided by Louis Thyroff and his then counsel showing that Louis Thyroff was not competing.

110. Louis Thyroff learned that Nationwide was developing a plan not to pay his Agency Security Compensation during December 2000 in a conversation with an employee in the Nationwide benefits office.

111. Thereafter, following discussions between then counsel for Louis Thyroff and counsel for Nationwide, Nationwide took the position that Louis Thyroff was indeed competing and that ASC would not be paid.

112. Statements from Nationwide to its counsel that Louis Thyroff was competing were deliberately false. Nationwide had no evidence whatsoever that Louis Thyroff was competing.

113. On December 20, 2000, with no evidence of probable cause to believe it could succeed or any good faith belief that Louis Thyroff was competing or using Nationwide

information, Nationwide initiated an action, begun with malice by the filing of the counterclaim, making the allegations quoted in Paragraphs 76 and 77 above.

114. On January 15, 2001, then counsel for Louis Thyroff provided counsel for Nationwide with specific evidence showing that Louis Thyroff was not competing with Nationwide.

115. On January 18, 2001, then counsel for Louis Thyroff provided more information showing that Louis Thyroff was not competing with Nationwide and again requested that Nationwide withdraw the counterclaim and pay Louis Thyroff his ASC payments.

116. The request for discontinuance of the counterclaim and for payment of the Agency Security Compensation was denied and the action for counterclaim continued.

117. Internal emails, correspondence and/or communications between Nationwide employees, on or about January 18, 2001, indicate that Nationwide did not have any evidence that Louis Thyroff was still in the insurance business.

118. On February 3, 2001, Dewez recommended that a "phone blitz" be conducted of Louis Thyroff's former customers who had canceled their Nationwide policies in an effort to find something that could be used to say Louis Thyroff was competing or directing customers away from Nationwide.

119. On February 13, 2001, Defendant Sharon Eastman, an agent who was eventually given a large portion of Louis Thyroff's business, sent an email to Nationwide (Eltz) requesting a determination as to whether it had been established that Louis Thyroff was competing, stating "Are you going to address the issue of whether this is reflex business or not in the near future?"

120. On February 13, 2001, Eltz responded to Defendant Sharon Eastman by email stating that as of that date Nationwide had no concrete evidence that Louis Thyroff was competing.

121. Under the Nationwide arrangement the decision whether to declare the departing agent's business to be "reflex", i.e., that he was competing, had to be made within six months.

122. At six months, absent a "reflex" declaration, the receiving agents had to start purchasing the business via the normal financial arrangement.

123. Nationwide's procedure was to send the receiving agents a "5th month letter," informing them as to whether they had to begin paying for the business.

124. On March 28, 2001, defendant Sharon Eastman sent an email to Dewez which stated as follows: "Thanks for attending the meeting yesterday and communicating NW's latest concerns and issues. Your reassurances and expertise always give me a warm fuzzy feeling. After our brief conversation about Thyroff, I am hopeful that the book of business may be classified as reflex. [Meaning Eastman would get the business for free.] Please keep me informed on this issue, as this will have a big impact on expansion plans for my agency. Also let me know, if there is anything I can do to assist you."

125. Dewez immediately forwarded Eastman's email to Eltz with an instruction that the email be forwarded to their legal counsel.

126. Addison Smith, Administrative Director of Nationwide, was the individual technically responsible for the decision whether to declare the departing agent's business to be "reflex".

127. On April 1, 2001, facing the deadline for the "reflex" determination, Eltz sent an email to Addison Smith requesting that Louis Thyroff's business be classified as reflex and that the five agents receiving the bulk of this business be given the business for free, stating "We are concerned that if we force them to pay for the business, it could undermine our litigation claiming he is competing." Eltz acknowledged that Nationwide had no evidence of competition but said Nationwide had "received many tips that Thyroff was still in the business."

128. Eltz's memo stated that a private investigator was attempting to gather evidence.

129. On information and belief, however, there was no private investigation at that point into whether Louis Thyroff was competing.

130. Without any further investigation or evidence of any competition, Addison Smith instructed Lowell R. Culp, Portfolio Manager of Nationwide, to classify Louis Thyroff 's business as reflex so that the receiving agents, the Defendants Sharon Eastman, Randy Ferraro, and Duane Weldon, and two others, Glenn Krause and Jill Corey, were not required to purchase Louis Thyroff's business.

131. Once classified as "reflex", each of the Defendants Sharon Eastman, Randy Ferraro, and Duane Weldon, and the other two, Glenn Krause and Jill Corcy, received a portion of Louis Thyroff 's business without cost to them.

132. Reacting to Nationwide's decision to classify Louis Thyroff's business as "Reflex" defendant Duane Weldon, exulted in the decision: "This business is now 'FREE'." Another, Jill Corey, thanked Dewez for his "efforts to have this book reclassified," saying "I do believe this move is in everyone's best interest."

133. Nationwide continued to prosecute its counterclaim despite knowledge of its lack of probable cause and its knowledge that continuing the counterclaim served as an impediment to Louis Thyroff's receipt of significant payments of Agency Security Compensation.

134. Nationwide continued to prosecute its counterclaim and deny payment of Agency Security Compensation despite repeated requests.

135. On April 14, 2004, Louis Thyroff moved for a summary judgment in the federal action, seeking an order summarily dismissing Nationwide's counterclaim and ruling that Nationwide had no basis for refusing to pay Louis Thyroff his Agency Security Compensation.

136. On October 26, 2004, the federal court granted that motion and found in favor of Louis Thyroff.

137. Between November 16, 2004 and April 4, 2005, Nationwide finally began to pay Louis Thyroff his long-delayed Agency Security Compensation and a small amount in pre- and post-judgment interest.

**AS AND FOR A FIRST CAUSE OF ACTION**
**AS AGAINST THE DEFENDANTS**

138. Plaintiffs, Louis E. Thyroff and Valerie Thyroff repeat and reallege each and every allegation set forth above with the same force and effect as if set forth herein.

139. As a critical and necessary part of its scheme to injure and cause a substantial and identifiable interference with Louis Thyroff, Nationwide enlisted defendants Sharon Eastman, Randy Ferraro, and Duane Weldon, each of whom was to be given a sizable portion of Louis

Thyroff's business, as co-conspirators to manufacture false evidence of Louis Thyroff's soliciting his former Nationwide policyholders.

140. These three defendants, and two others, Glenn Krause and Jill Corey, were instructed that Nationwide needed such information in order to support its legal position in the federal lawsuit.

141. To reward the agents for their participation in the scheme, Nationwide told them that they would be given Louis Thyroff's business for free if they could provide the desired information. Otherwise, they would have to purchase their respective shares of the business.

142. The three defendants willingly joined the conspiracy and, during the period December 2000 through April 2001, with the continuing solicitation and encouragement of Nationwide, committed overt acts in furtherance of the civil conspiracy, providing Nationwide with a variety of unsubstantiated tips and fraudulent suggestions that Louis Thyroff was soliciting the policyholders.

143. Nationwide knew that Louis Thyroff was not engaging in any competitive activities and, having confiscated all of his business information, that he did not have the means to do so.

144 Each of the defendants Sharon Eastman, Randy Ferraro, and Duane Weldon knew, or should have known, that Louis Thyroff was not engaging in any competitive activities but nevertheless, as overt acts in furtherance of a civil conspiracy, provided Nationwide with unsubstantiated false information concerning Louis Thyroff's involvement in the insurance business following the termination of his contract.

145. Nationwide aggressively solicited the Defendants Sharon Eastman, Randy Ferraro, and Duane Weldon and accepted their false and unsubstantiated information, using the resulting agent tips as its excuse to claim in the federal litigation that Louis Thyroff was soliciting his policyholders and to declare the Thyroff business as "reflex", which it viewed as a necessary step in order to maintain its legal position in the federal litigation.

146. As detailed above, defendants Sharon Eastman, Randy Ferraro, and Duane Weldon intentionally participated in the civil conspiracy through their overt acts, resulting in a highly substantial and identifiable interference, harm, special injury and damages to the Plaintiffs, Louis B. Thyroff and Valerie Thyroff.

147. Using the agents "tips" as an excuse, Nationwide instituted and maintained an action against Louis Thyroff in federal court by assertion of a counterclaim.

148. Nationwide's counterclaim in the federal action alleging that Louis Thyroff, after the termination of the contract, had "induced Nationwide policyholders to lapse, cancel and otherwise replace current, in force, insurance contracts with Nationwide" and had "furnished to more than one person or organization proprietary and confidential information relating to Nationwide policyholders" was developed, filed, and pursued without probable cause and with malice.

149. At no point between the termination of Louis Thyroff's contract on September 19, 2000 and the summary dismissal of the counterclaim on October 26 2004 and after, did Nationwide ever hold any good faith belief that Louis Thyroff had done anything even remotely resembling what the counterclaim accused him of doing.

150. Nationwide had clear evidence throughout the entire period in question that Louis Thyroff was *not* engaging in any of the actions described in the counterclaim.

151. The purpose of the counterclaim was not to enforce any right of Nationwide or to compensate Nationwide for any injury. The apparent purpose was simply to inflict as much damage as possible on Louis Thyroff, to assure that he would not have the financial capability to re-enter the business and compete with Nationwide after a year, to retaliate for his lawsuit, and to make an example of him to intimidate other agents who might consider leaving.

152. Using the allegations of the counterclaim as its legal basis, Nationwide refused to pay Louis Thyroff the Agency Security Compensation which he needed to support himself and his family after his contract was terminated and his business information confiscated.

153. When Nationwide did this, it knew that this would deprive Louis Thyroff of his sole means of support after his business information was confiscated and he was disabled from continuing with his business, leading to a special injury in the form of highly substantial and identifiable interference with Plaintiffs, Louis E. Thyroff and Valerie Thyroff.

154. This refusal to pay Louis Thyroff continued over the course of the counterclaim's existence, for four years, until November 16, 2004, when Nationwide finally acceded in the face of a summary ruling dismissing the counterclaim and finding that Nationwide had no basis for refusing to pay the Agency Security Compensation.

155. During those four years, Plaintiff, Louis E. Thyroff and Plaintiff, Valerie Thyroff and their family were devastated financially by Nationwide's scheme to accuse Louis Thyroff of soliciting and withholding his Agency Security Compensation.

156. Without any means of financial support while he first looked for alternative employment outside the insurance industry, and in the ensuing years during which he was subjected to a significantly reduced income level, Louis Thyroff was forced to liquidate all of the family's financial assets, including IRA's, life insurance policies, and pension funds. He was also forced to make a quick sell of the building in which his insurance agency had been located, for less than its market value.

157. The job Louis Thyroff eventually secured at a fraction of his former income did not provide a sufficient salary to meet the financial obligations of the family with three children. Without the support of the Agency Security Compensation that should have been there, Louis and Valerie Thyroff had to borrow extensively from relatives to pay household expenses, college costs, medical costs, and other costs of living. These loans must all be paid back, with appropriate interest.

158. To remedy these financial injuries Plaintiffs, Louis E. Thyroff and Valerie Thyroff Thyroff are entitled to an award of compensatory damages in an amount which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

159. The behavior of the Defendants in falsely accusing Louis Thyroff and then withholding his Agency Security Compensation on the basis of the false accusations was willful and wanton, evincing a conscious disregard for the rights of others. The defendants' apparent motives to disable Thyroff from returning to business after a year, to retaliate against Louis Thyroff for filing his lawsuit, inflict maximum damage on him, and make an example of him to intimidate others, were evil and fraudulent, as was the conspiring agents' fraudulent desire to obtain a business for free when they knew there was no basis for taking such an advantage.

160. An award of punitive damages as against the Defendants is necessary in order to deter them from engaging in such outrageous conduct toward its agents and the public in the future.

**AS AND FOR A SECOND CAUSE OF ACTION AGAINST NATIONWIDE**

161. Plaintiffs, Louis E. Thyroff and Valerie Thyroff repeat and reallege each and every allegation set forth above with the same force and effect as if set forth herein.

162. Nationwide's counterclaim in the federal action alleging that Louis Thyroff, after the termination of the contract, had "induced Nationwide policyholders to lapse, cancel and otherwise replace current, in force, insurance contracts with Nationwide" and had "furnished to more than one person or organization proprietary and confidential information relating to Nationwide policyholders" was developed, filed, and pursued without probable cause and with malice. At no point between the termination of Louis Thyroff's contract on September 19, 2004 and the summary dismissal of the counterclaim on October 26 2004 or after did Nationwide ever hold any good faith belief that Louis Thyroff had done anything even remotely resembling what the counterclaim accused him of doing. Beyond that, Nationwide had clear evidence throughout the period in question that Louis Thyroff was *not* engaging in any of the actions described in the counterclaim. The purpose of the counterclaim was not to enforce any right of Nationwide or to compensate Nationwide for any injury. The apparent purpose was simply to inflict as much damage as possible on Louis Thyroff to disable him from re-entering the business after a year, to

retaliate for his lawsuit, and to make an example of him to intimidate other agents who might consider leaving.

163. Using the allegations of the counterclaim as its legal basis, Nationwide refused to pay Louis Thyroff the Agency Security Compensation which he needed to support himself and his family after his contract was terminated and his business information confiscated. When Nationwide did this, it knew that this would deprive the Thyroff family of its sole means of support after his business information was confiscated and he was disabled from continuing with his business. This refusal to pay continued for four years, until November 16, 2004, when Nationwide finally capitulated in the face of a summary ruling dismissing the counterclaim and finding that Nationwide had no basis for refusing to pay the Agency Security Compensation.

164. During those four years, Louis Thyroff and his family were devastated financially by Nationwide's scheme to accuse Thyroff of soliciting and withholding his Agency Security Compensation. Without any means of financial support while he first looked for alternative employment outside of the insurance industry, and in the ensuing years during which he was subjected to a significantly reduced income level, Louis Thyroff was forced to liquidate all of his financial assets, including IRA's, life insurance policies, and pension funds. He was also forced to make a quick sale of the building in which his insurance agency had been located, at less then market value. Those assets are gone permanently. The job Louis Thyroff eventually secured at a fraction of his former income did not provide a sufficient salary to meet the financial obligations of the family with three children. Without the support of the Agency Security Compensation that should have been there, Louis and Valerie Thyroff had to borrow extensively from relatives to pay household expenses, college costs, medical costs, and other costs of living. To remedy these

169. That by reason of the foregoing, Plaintiff Valerie Thyroff was deprived of the society, services and consortium of the Plaintiff, Louis E. Thyroff and shall forever be deprived of said society, services and consortium.

170. That by reason of the foregoing, Plaintiff Valerie Thyroff was damaged in an amount which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

WHEREFORE, Plaintiffs, Louis E. Thyroff and Valerie Thyroff demand judgment against the Defendants in a sum which exceeds the jurisdictional limits of all lower courts which otherwise would have jurisdiction, in addition to costs and disbursements of this action.

DATED: October 25, 2005

**BROWN & TARANTINO, LLC**
Attorneys for Plaintiffs

By: Lisa Serio Siragusa
Lisa Serio Siragusa, Esq.
45 Exchange Boulevard, Suite 300
Rochester, NY 14614
TEL: (585) 454-3377

William P. Tedards, Jr., Esq.
1101 30th Street, N.W., Suite 500
Washington, D.C. 20007
TEL: (202) 797-9135